UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE 79TH GROUP, INC.,

                              Plaintiff,

                  -against-

JACOB MOORE,

                              Defendant.

Case No. 1:23-cv-02521 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

The 79th Group, Inc. ("Plaintiff") sued Jacob Moore ("Defendant") under New York

common-law theories of injurious falsehood and defamation.  ECF No. 1 (the "Complaint" or

"Compl.").  Defendant, who is *pro se*, has moved to dismiss the Complaint under Federal

Rule of Civil Procedure ("Rule") 12(b)(2) for lack of personal jurisdiction.  ECF Nos. 29

("Br."), 38 ("Reply"); *see also* ECF No. 39.  Plaintiff opposes this motion.  ECF No. 33

("Opp."); *see also* ECF Nos. 34 ("Brett Decl."), 35 ("Jake Decl.").

For the following reasons, Defendant's motion is GRANTED.

## BACKGROUND[1]

Plaintiff is a Delaware corporation with its principal place of business in New York,

New York.  Compl. ¶ 9.  It focuses on real estate and natural-resources development.  *Id.* ¶ 11.

---

[1] The facts in this section come from several sources.  The Court assumes that the Complaint's
factual allegations are true for purposes of deciding the motion to dismiss.  *See Dorchester
Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013) (per curiam).  The Court
also exercises its discretion to consider materials outside the pleadings, including affidavits
submitted by the parties.  *See id.* at 84 ("[I]n deciding a pretrial motion to dismiss for lack of
personal jurisdiction a district court has considerable procedural leeway.  It may determine the
motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it
may conduct an evidentiary hearing on the merits of the motion." (citation omitted)); *Raskin
v. Compania de Vapores Realma, S.P.*, 521 F. Supp. 337, 339 (S.D.N.Y. 1981) ("Courts in
this Circuit have consistently held that affidavits may be properly relied upon when ruling on
a motion to dismiss for lack of personal jurisdiction.").  Further, the Court considers
information subject to judicial notice.  *See Williams v. N.Y.C. Hous. Auth.*, 61 F.4th 55, 61 n.2

Plaintiff was incorporated on November 17, 2022, as a wholly owned subsidiary of a United

Kingdom corporation called The 79th Group Limited (the "Parent Company"). *Id.*[2]  "Plaintiff

acts as the North American arm for its Parent Company's real estate investment, acquisition,

and development enterprise." *Id.*

Defendant is a Spanish citizen who resides in London, U.K.  *Id.* ¶¶ 2, 13.  He is an

investor affiliated with several corporate entities in the financial-services, mineral-extraction,

and music industries, including a U.K. company called Triumph Capital Ltd. ("Triumph"), for

which he serves as owner and director.  *Id.* ¶¶ 14-17.  He "actively markets his business

services throughout the United States and Europe and transacts business with investors in both

Europe and the United States, including in the State of New York."  *Id.* ¶ 14.  One way that

Defendant markets his services is by writing articles for several U.S.-based publications,

including *Cross Fork News* (based in Winnetka, California), *Auburn Digest* (based in Pleasant

<hr>

(2d Cir. 2023) ("[T]he Court may take judicial notice of facts generally known within the
territorial jurisdiction or facts capable of accurate and ready determination by resort to sources
whose accuracy cannot reasonably be questioned." (quotation marks and citation omitted)).

[2] In the Complaint, Plaintiff does not precisely identify when it was incorporated, although the
Complaint states that the Parent Company had the "intent to incorporate" the Plaintiff
corporation in June 2022, Compl. ¶ 25, and that the Parent Company had established Plaintiff
by mid-November 2022, *see id.* ¶¶ 30-31.  The Court ascertained Plaintiff's precise date of
incorporation by accessing a website run by the State of Delaware and searching for "The
79th Group."  *See Entity Search*, Del. Dep't of State, Div. of Corps.,
https://icis.corp.delaware.gov/eCorp/EntitySearch/NameSearch.aspx (last visited Jan. 3,
2024).  The Court may take judicial notice of Plaintiff's date of incorporation because it is a
fact that "can be accurately and readily determined from sources whose accuracy cannot
reasonably be questioned."  Fed. R. Evid. 201(b)(2); *see Vill. Green at Sayville, LLC v. Town
of Islip*, 43 F.4th 287, 299 n.7 (2d Cir. 2022) ("A court may take routine judicial notice of
documents retrieved from official government websites." (brackets, quotation marks, and
citation omitted)); *Brokamp v. James*, 66 F.4th 374, 381 & n.3 (2d Cir. 2023) (upon
consulting a government website, taking judicial notice of the year that the plaintiff was first
licensed to practice mental-health counseling).

Hill, Oregon), *Chicago Weekly* (based in Stateline, Nevada), and *The Hustler's Digest* (based in Portland, Oregon). *Id.*; Brett Decl. ¶ 9.

In January 2022, Defendant – acting on behalf of Triumph – approached directors affiliated with the Parent Company. Compl. ¶ 19. He told the directors that he could introduce the Parent Company to potential investors. *Id.* ¶ 20. Thereafter, the Parent Company conducted due-diligence inquiries regarding Defendant and Triumph. *Id.* The Parent Company did not know, however, that Defendant had "obscure[d] and manipulate[d] information about his business activities." *Id.* ¶ 21. On January 13, 2022, the Parent Company entered into an agreement with Triumph. *Id.* ¶ 23. Under the agreement, Triumph would earn commissions by introducing investors to the Parent Company and its subsidiaries. *Id.* The Parent Company did not know that Defendant's services "were tainted by conflicts of interest, in that the Defendant was introducing his own investment clients to the Parent Company, and thus taking commission on both sides of the deal." *Id.* ¶ 24.

In June 2022, Jake Webster ("Jake") – who presently serves as managing director of both Plaintiff and the Parent Company – informed Defendant about "the Parent Company's intent to incorporate a wholly owned subsidiary, the Plaintiff, in the United States, and base its operations in New York City," as well as about "the Parent Company's efforts to dramatically expand the scope of its investment business in North America." *Id.* ¶ 25; *see* Jake Decl. ¶¶ 1, 4. Jake also told Defendant that the Parent Company intended for its U.S. entity to file for a public securities listing by the first quarter of 2023, and that the Parent Company had hired a New York City-based securities attorney to facilitate this process. Compl. ¶ 26. Defendant was "keenly interested in the Parent Company's business plan," especially the part involving the Parent Company's intent to incorporate a U.S. subsidiary, and he "expressed his desire to become involved with the U.S. entity, knowing that it would

be focused – in measurable part – upon investments in the natural resource sector." *Id.* ¶ 27.
Defendant touted "his business clientele and potential investors based within the State of New
York, as well as the Defendant's purported experience in natural resource sector investments."
*Id.*

In the months that followed, "Defendant pressed the Parent Company – by and
through its officer-directors – to enter into a joint venture agreement to expand upon the
business relationships between the Parent Company, its subsidiaries – including the planned
U.S. company (i.e., the Plaintiff) – and the Defendant." *Id.* ¶ 28; *see also id.* ¶ 29.  By the
middle of November 2022, these tactics had escalated to Defendant threatening to "cease
performing under his existing introducer's agreement with the Parent Company and interfere
with existing investor relationships until a joint venture agreement was entered." *Id.* ¶ 30.

On November 20, 2022, Jake sent a WhatsApp message to Defendant. *Id.* ¶ 30; Jake
Decl. ¶ 18.  The message stated:

> Hi Jacob,
>
> Thanks for the message, however we have been extremely busy
> the last few weeks with the launch of the fund, as well as our
> US offering.
>
> I know we discussed the prospect of exclusivity of a particular
> loan note however we are subscribing our loan notes faster than
> expected, and following a meeting with our team it doesn't
> make commercial sense for us to enter into an arrangement like
> this at this time.
>
> Myself and Curtis really enjoy working with yourself, and we'll
> continue to provide your clients with the best service as always
> mate.  [fist-bump emoji]
>
> Many thanks
>
> Jake

ECF No. 35-1 at 2.

Defendant responded by "announc[ing] that he would be withdrawing his company from its preexisting introducers' agreement with the Parent Company."  Compl. ¶ 34. Defendant also revealed that "the investors that he had introduced to the Parent Company were also his 'clients' and that he would be encouraging them to withdraw their investment funds from the Parent Company as well."  *Id.*

On November 28, 2022, in a series of WhatsApp messages to Jake, Defendant "obliquely referenced" rumors that all other agents associated with Plaintiff and the Parent Company over the previous two years were backing out of investment relationships.  *Id.* ¶ 37. In that same set of messages, Defendant accused Plaintiff and the Parent Company of engaging in a Ponzi scheme, and he stated that Jake, Plaintiff, and the Parent Company "did not 'want to have [him] on the wrong side.'"  *Id.* ¶¶ 38-39 (brackets in original).  When pressed by Jake for the identities of the people spreading these rumors, Defendant responded that Jake should not "mess with" the people who had "warned" him.  *Id.* ¶¶ 42-44.

Also on November 28, 2022, Defendant "urged all of his clients to terminate their investment relationship with the Plaintiff's Parent Company," and in doing so, he "disseminated to these clients false information regarding the business practices of the Plaintiff along the lines of the false allegations Defendant had made to Jake Webster."  *Id.* ¶ 45.  On November 30, 2022, Defendant "again threatened" to "label the Plaintiff as being a Ponzi scheme to his clients – which, in many instances, were also the Plaintiff's clients."  *Id.* ¶ 46.  Defendant subsequently followed through on his threat, "resulting in the Plaintiff's loss of investors and investment funds" (the "Client Contacts").  *Id.*

In the middle of December 2022, Defendant created a public post on LinkedIn.  *Id.* ¶ 50; *see* Brett Decl. ¶ 8; ECF No. 34-5 (the "LinkedIn Post").  Defendant's profile has over 500 followers.  Brett Decl. ¶ 7.  The post stated:

> Circumventing in business from a trusted partner is unethical
> and concerning!  Specially after we've raised £2M from OUR
> investors for their developments over the past 12 months.
>
> We've now terminated our relationship with @the79thgroup
> spearheaded by David Webster, at Southport.
>
> To all agents looking to work with the @the79thgroup be
> AWARE.  The moment you start asking hard questions relating
> to their developments and the lack of progres[s] reports, they
> will terminate your agreement and slap you with a threatening
> letter from their solicitors forcing you to stop communicating
> with YOUR OWN clients!  I know , absurd!
>
> I've been in this game for 15 years, and I have raised millions
> for many developers accross [sic] the UK , but I have never
> come across such a disgusting, shady, unethical company.
>
> #circumventing #beaware #business #the79thgroup

LinkedIn Post at 2.  The post "was reposted multiple times by others."  Compl. ¶ 51.

On December 19, 2022, Defendant sent an email to David Webster ("David"), the

chair of Plaintiff's board.  *Id.* ¶ 53; *see* Brett Decl. ¶ 10; ECF No. 34-7 (the "Email").  Godwin

Developments Ltd. ("Godwin") was copied on the Email.  Compl. ¶ 53; *see* Email at 8.

Godwin is a U.K.-based "real estate development firm affiliated with the New York-based

real estate investment firm Godwin Capital."  Brett Decl. ¶ 10.[3]  The Email alleged, among

other things, that "Plaintiff (i) refused to provide timely progress reports to investors,

(ii) refused to answer investor questions, (iii) refused to respect investor wishes that

communications with investors be made between the Plaintiff and the Defendant; and (iv) that

the Plaintiff's Investment Director, Curtis Webster, acted unprofessionally during a meeting

with the Defendant in Dubai."  Compl. ¶ 54.  Defendant further accused David and Jake of

---

[3] The Brett Declaration includes a link to the "Contact Us" page of a website for the Godwin
Group.  *See* Brett Decl. ¶ 10.  As of the date of this opinion, that page lists addresses in
Birmingham, U.K., London, and New York.  *See Contact Us*, Godwin Grp.,
https://godwingroup.co.uk/contact-us/ [https://perma.cc/9S84-6K2R].

being "Gold Scammers," and David of being "Racist and a sex-pest."  Email at 5 (emphasis omitted).

As a result of Defendant's conduct, "Plaintiff has experienced a loss of investors who previously expressed interest to invest, as well as damage to the Plaintiff's reputation with institutional and other potential investment interests."  Compl. ¶ 61; *see id.* ¶ 68 (identifying special damages "thus far consist[ing] of the loss of approximately four (4) to five (5) investors who were otherwise prepared to invest funds with the Plaintiff").

Plaintiff filed the Complaint on March 24, 2023.  *See generally id.*  Plaintiff accused Defendant of committing the intentional torts of injurious falsehood and defamation.  *Id.* ¶¶ 62-74.

On August 11, 2023, Defendant "move[d] for an Order granting this Motion for dismissal of the complaint and strike out of the action for jurisdiction and abuse of process." Br. at 2; *see id.* (raising, as the sole ground for dismissal, "[w]hether the Court has personal jurisdiction over the Defendant").  The Court, like Plaintiff, construes Defendant's motion as made "pursuant to [Rule] 12(b)(2), to dismiss the complaint for lack of personal jurisdiction." Opp. at 1 n.1; *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) ("A document filed *pro se* is to be liberally construed." (quotation marks and citation omitted)); *United States v. Besneli*, No. 14-cv-07339 (JFK), 2018 WL 443747, at *3 (S.D.N.Y. Jan. 16, 2018) (construing *pro se* filing as motion to dismiss under Rule 12(b)(2)).

Plaintiff opposed Defendant's motion on September 5, 2023, arguing that the Court has specific personal jurisdiction over Defendant by virtue of N.Y. C.P.L.R. 302(a)(1)

("Section 302(a)(1)").  *See* Opp. at 7 (citing Compl. ¶ 7).  Defendant filed a reply on

September 25, 2023.  Reply.[4]

## LEGAL STANDARD

"A plaintiff bears the burden of demonstrating personal jurisdiction over a person or

entity against whom it seeks to bring suit."  *Troma Ent., Inc. v. Centennial Pictures Inc.*, 729

F.3d 215, 217 (2d Cir. 2013) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30,

34 (2d Cir. 2010)).  "In order to survive a motion to dismiss for lack of personal jurisdiction, a

plaintiff must make a prima facie showing that jurisdiction exists."  *Edwardo v. Roman Cath.*

*Bishop of Providence*, 66 F.4th 69, 73 (2d Cir. 2023) (quoting *Eades v. Kennedy, PC L. Offs.*,

799 F.3d 161, 167-68 (2d Cir. 2015)).  Put otherwise, a plaintiff must make "legally sufficient

allegations of jurisdiction, including an averment of facts that, if credited, would suffice to

establish jurisdiction over the defendant."  *Schwab Short-Term Bond Mkt. Fund v. Lloyds*

*Banking Grp. PLC*, 22 F.4th 103, 121 (2d Cir. 2021) (quoting *Penguin*, 609 F.3d at 35).

On a motion to dismiss for lack of personal jurisdiction, a court generally "accept[s] as

true all factual claims in the complaint and draw[s] all reasonable inferences in the plaintiff's

favor."  *Fat Brands Inc. v. Ramjeet*, 75 F.4th 118, 125 (2d Cir. 2023) (quoting *Fink v. Time*

*Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013) (per curiam)); *see also A.I. Trade Fin.,*

*Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993) (same for jurisdictional allegations

included in affidavits).  But where a "conclusory allegation" is contradicted by a properly

---

[4] The Court notes that Defendant's reply brief was filed 6 days after the deadline.  *See* ECF
No. 31.  The Court heeds the Second Circuit's instruction that the "special solicitude"
afforded to *pro se* litigants "includes leniency in the application of procedural rules."  *Rosa v.*
*Doe*, 86 F.4th 1001, 1007 (2d Cir. 2023).  The Court finds that this delay in reply has
prejudiced neither Plaintiff nor the Court, so the Court exercises its discretion to consider
Defendant's tardy filing.  In any event, the Court's decision herein would be the same even if
it disregarded Defendant's reply brief.

considered document, "the document controls and the allegation is not accepted as true."
*Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011) (per curiam);
*accord Kramer v. Time Warner Inc.*, 937 F.2d 767, 774-75 (2d Cir. 1991) (document subject
to judicial notice "misrepresented neither the form nor the value of the [m]erger
[c]onsideration actually received," and the court was not required to accept the complaint's
characterization to the contrary).

## DISCUSSION

### I.   The Court Lacks Personal Jurisdiction Over Defendant

"Before a court may exercise personal jurisdiction over a defendant, three
requirements must be met: (1) the plaintiff's service of process upon the defendant must have
been procedurally proper; (2) there must be a statutory basis for personal jurisdiction that
renders such service of process effective; and (3) the exercise of personal jurisdiction must
comport with constitutional due process principles." *Schwab*, 22 F.4th at 121 (quotation
marks and citation omitted).  For the second requirement, excluding a "few exceptions not
applicable to the case at bar, the existence of such a statutory basis is determined by the law of
the state in which the court is located – here, New York." *Troma*, 729 F.3d at 218 (quotation
marks and citation omitted).

Defendant does not argue that service of process upon him was procedurally
improper.  *See generally* Br.; Reply.  Thus, he has forfeited such an argument.  *See Hamer v.
Neighborhood Hous. Servs. of Chi.*, 583 U.S. 17, 20 n.1 (2017) ("Forfeiture is the failure to
make the timely assertion of a right." (brackets and citation omitted)); *see, e.g.*, *Spetner v.
Palestine Inv. Bank*, 70 F.4th 632, 639 n.6 (2d Cir. 2023) ("[The defendant] does not
challenge plaintiffs' service of process, which is also required for personal jurisdiction.").
The Court therefore assumes that Defendant was properly served.

As explained below, however, Plaintiff successfully challenges the two other requirements for personal jurisdiction – namely, the existence of a statutory basis for jurisdiction and the need to comport with the requirements of due process.  Accordingly, the Court grants Plaintiff's motion to dismiss for lack of personal jurisdiction.

### A.  Statutory Basis for Personal Jurisdiction

Plaintiff invokes only Section 302(a)(1) as the statutory basis for the Court to exercise personal jurisdiction here.  *See* Opp. at 7 (citing Compl. ¶ 7).  The Court is not persuaded that Section 302(a)(1) supports exercising personal jurisdiction in this case.

Under New York's long-arm statute, "a court may exercise personal jurisdiction over any non-domiciliary" who "transacts any business within the state."  N.Y. C.P.L.R. 302(a)(1).  In construing Section 302(a)(1), the Court is bound by interpretations of the statute by the New York Court of Appeals.  *See Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) (absent "extreme circumstances not present here," "state courts are the ultimate expositors of state law"); *Rubin v. Garvin*, 544 F.3d 461, 468 n.11 (2d Cir. 2008) ("We are bound by the construction of state statutes propounded by a state's highest court.").  The Court must also follow binding Second Circuit precedent construing Section 302(a)(1).  *See Henkel v. Wagner*, No. 12-cv-04098 (AJN), 2013 WL 12084503, at *4 (S.D.N.Y. Mar. 18, 2013) ("Even on issues of state law, the Court is bound by Second Circuit precedent." (citation omitted)), *aff'd*, 553 F. App'x 106 (2d Cir. 2014) (summary order).

"At the outset, the Court notes that the same jurisdictional analysis – that which is applicable to defamation claims – applies to both claims brought here."  *Giannetta v. Johnson*, No. 20-cv-09016 (PAE), 2021 WL 2593305, at *9 (S.D.N.Y. June 24, 2021).  It is generally true that injurious falsehood is a "tort separate and distinct from the tort of defamation." *Espire Ads LLC v. TAPP Influencers Corp.*, 655 F. Supp. 3d 223, 259 (S.D.N.Y. 2023)

(citation omitted).  But a plaintiff "may not evade the statutory exception[s] [applicable to defamation claims] by recasting [its] cause of action as something other than defamation." *Cantor Fitzgerald, L.P. v. Peaslee*, 88 F.3d 152, 157 (2d Cir. 1996).  Hence, an injurious-falsehood claim does not "independently establish personal jurisdiction under subparagraphs (2) and (3)" of Section 302(a) when "the entire complaint sounds in defamation."  *Id.*; *see Fahey v. Breakthrough Films & Television Inc.*, No. 21-cv-03208 (PAE), 2022 WL 4547438, at *7 (S.D.N.Y. Sept. 29, 2022) (collecting cases).  Here, Plaintiff's injurious-falsehood claim sounds in defamation because it "rest[s] on Defendant['s] allegedly defamatory statements." *G31000 N. Am., Inc. v. Paris*, No. 14-cv-03885 (VEC), 2014 WL 6604790, at *3 (S.D.N.Y. Nov. 21, 2014); *see Common Cents Distribs., LLC v. CURLS Beauty Brands, LLC*, No. 20-cv-10369 (CM), 2021 WL 4226182, at *5 (S.D.N.Y. Sept. 15, 2021) ("A claim sounds in defamation if, after looking for the reality and the essence of the claim and not its mere name, the court finds it to be based upon the alleged defamatory statements." (brackets, quotation marks, and citation omitted)).  Thus, for purposes of Section 302(a)(1), Plaintiff's injurious-falsehood claim is treated the same as Plaintiff's defamation claim.  With that understanding, the Court turns to the statute itself.[5]

Most states' long-arm statutes "explicitly provide, or have been interpreted to provide, that jurisdiction will be permitted to the full extent allowed by the federal Constitution."  *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 244 (2d Cir. 2007).  "The reach of New York's long-arm statute, by contrast, does not coincide with the limits of the Due Process Clause."  *Id.* "Importantly for present purposes, sections 302(a)(2) and (3), which permit jurisdiction over

---

[5] Even if Section 302(a)(1) provided a statutory basis for personal jurisdiction over Plaintiff's injurious-falsehood claim, the requirements of due process would nonetheless bar the Court from exercising personal jurisdiction over the claim, as explained below.

tortious acts committed in New York and those committed outside New York that cause injuries in the state, respectively, explicitly exempt causes of action for the tort of defamation from their scope, whether or not such jurisdiction would be consistent with due process protection." *Id.* at 244-45 (footnote omitted).  "The defamation exceptions thus create a 'gap' between the jurisdiction conferred by the New York statute and the full extent of jurisdiction permissible under the federal Constitution." *Id.* at 245; *accord Ehrenfeld v. Bin Mahfouz*, 881 N.E.2d 830, 837 (N.Y. 2007) ("[W]e have repeatedly recognized that New York's long-arm statute does not confer jurisdiction in every case where it is constitutionally permissible." (quotation marks and citation omitted)).

Section 302(a)(1) can provide a basis for personal jurisdiction over defamation claims. *See, e.g.*, *Tannerite Sports, LLC v. NBCUniversal Media LLC*, 135 F. Supp. 3d 219, 230 (S.D.N.Y. 2015), *aff'd*, 864 F.3d 236 (2d Cir. 2017).  "To establish personal jurisdiction under section 302(a)(1), two requirements must be met: (1) [t]he defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." *Eades*, 799 F.3d at 168 (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013)).  Typically, "proof of one transaction in New York is sufficient to invoke jurisdiction [under Section 302(a)(1)], even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Deutsche Bank Sec., Inc. v. Mont. Bd. of Invs.*, 850 N.E.2d 1140, 1142 (N.Y. 2006) (quoting *Kreutter v. McFadden Oil Corp.*, 522 N.E.2d 40, 43 (N.Y. 1988)).

"In defamation cases," however, "New York courts construe 'transacts any business within the state' more narrowly than in other types of litigation." *Satanic Temple, Inc. v. Newsweek Mag. LLC*, --- F. Supp. 3d ----, 2023 WL 2403136, at *3 (S.D.N.Y. Mar. 8, 2023);

*accord Best Van Lines*, 490 F.3d at 248; *SPCA of Upstate N.Y., Inc. v. Am. Working Collie Ass'n*, 963 N.E.2d 1226, 1230 (N.Y. 2012).[6]  "In defamation cases the single act of uttering a defamation, no matter how loudly, is not a transaction of business that may provide the foundation for personal jurisdiction." *Reich v. Lopez*, 858 F.3d 55, 64 (2d Cir. 2017) (ellipsis and citation omitted).  "New York courts have found jurisdiction in cases where the defendants' out-of-state conduct involved defamatory statements *projected into New York and targeting New Yorkers*, but only where the conduct also included *something more*." *Best Van Lines*, 490 F.3d at 249 (emphases added).  "In other words, when the defamatory publication itself constitutes the alleged transaction of business for the purposes of section 302(a)(1), more than the distribution of a libelous statement must be made within the state to establish long-arm jurisdiction over the person distributing it." *Id.* at 248 (brackets and quotation marks omitted).  Rather, a plaintiff must show that: "(1) the defamatory utterance was purposefully directed at New York, as opposed to reaching New York fortuitously; and (2) the defendant transacted other business in New York that was directly connected to the claim asserted." *Tannerite Sports*, 135 F. Supp. 3d at 230 (citation omitted); *accord Knight-*

---

[6] Consequently, the non-defamation cases cited by Plaintiff are inapposite.  *See* Opp. at 8-13 (citing *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158 (2d Cir. 2010) (trademark infringement and unfair competition); *A.I. Trade Fin.*, 989 F.2d 76 (breach of contract); *RV Skincare Brands LLC v. Digby Invs. Ltd.*, 394 F. Supp. 3d 376 (S.D.N.Y. 2019) (trademark infringement, counterfeiting, and unfair competition); *Pilates, Inc. v. Pilates Inst., Inc.*, 891 F. Supp. 175 (S.D.N.Y. 1995) (trademark infringement); *Klagsbrun v. Ross*, No. 93-cv-07709 (MBM), 1995 WL 43664 (S.D.N.Y. Feb. 3, 1995) (breach of contract); *Nat'l Cathode Corp. v. Mexus Co.*, 855 F. Supp. 644 (S.D.N.Y. 1994) (breach of fiduciary duty, breach of contract, tortious interference with contractual relations, tortious interference with prospective economic advantage, conversion, and fraud); *Licci v. Lebanese Canadian Bank, SAL*, 984 N.E.2d 893 (N.Y. 2012) (commission of international terrorism, aiding and abetting international terrorism, aiding and abetting violations of international law, negligence, and violation of an Israeli statute), *conformed to answer to certified questions*, 732 F.3d 161; *Kreutter*, 522 N.E.2d 40 (fraud, conversion, and breach of contract); *Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc.*, 209 N.E.2d 68 (N.Y. 1965) (personal injury)).

*McConnell v. Cummins*, No. 03-cv-05035 (NRB), 2005 WL 1398590, at *3 (S.D.N.Y. June 13, 2005) ("The mere fact that the allegedly defamatory postings may be viewed in New York is insufficient to sustain a finding of jurisdiction.  Instead, jurisdiction will lie only if the posting is intended to target or focus on internet users in the state where the cause of action is filed." (ellipsis, quotation marks, and citations omitted)); *Seldon v. Direct Response Techs., Inc.*, No. 03-cv-05381 (SAS), 2004 WL 691222, at *4 (S.D.N.Y. Mar. 31, 2004) (similar).

*SPCA* is instructive as to the nature and degree of in-state conduct that New York courts require before finding that Section 302(a)(1)'s requirements are met in a defamation case.  In *SPCA*, the plaintiff (a New York resident) agreed to shelter 23 dogs rescued by the state police.  *See* 963 N.E.2d at 1227.  Upon learning about this, the defendant (a Vermont resident) called the plaintiff twice; the defendant also made a $1,000 donation to the plaintiff and offered to deliver additional collars and leashes.  *See id.* at 1227-28.  Shortly thereafter, the defendant drove to New York.  *See id.* at 1228.  She stopped "for less than one hour," during which time she "delivered the leashes and collars," "toured the [plaintiff's] facility," and "wrote a personal check to the [plaintiff] to cover the costs of certain veterinary care."  *Id.* Later that month, the defendant telephoned the plaintiff once more and "discussed the appropriate care for one of the collies."  *Id.*  "In addition, on several weekends, volunteers who were affiliated with [the defendant's organization] assisted in providing care for the dogs."  *Id.*  About two months after her first visit, the defendant visited the New York facility "for about an hour and a half, to check on the collies."  *Id.*  Subsequently, the defendant wrote several posts on her organization's website "addressing the condition of the collies and the treatment being provided by the [plaintiff]."  *Id.*  Based on the website posts, the plaintiff sued the defendant for defamation.  *See id.*

The New York Court of Appeals held that Section 302(a)(1) did not support exercising personal jurisdiction over the defendant.  *See id.*  It explained that "[w]hen determining whether the necessary substantial relationship exists between a defendant's purposeful activities and the transaction giving rise to the defamation cause of action, [New York courts] have considered whether the relationship between the activities and the allegedly offending statement is too diluted."  *Id.* at 1229.  "[W]here the contacts are more circumscribed and not directly related to the defamatory statement, defendants have prevailed" on motions to dismiss for lack of personal jurisdiction.  *Id.*  Regarding the case before it, the court explained that the defendant's "activities in New York were quite limited.  [The defendant's] three phone calls and two short visits – totaling less than three hours – in addition to the donation of cash and leashes, do not constitute purposeful activities related to the asserted cause of action that would justify bringing her before the New York courts."  *Id.*  The court stressed the "importance" of the fact that "the statements were not written in or directed to New York.  While they were posted on a medium that was accessible in this state, the statements were equally accessible in any other jurisdiction."  *Id.*  The court also concluded that there was "no substantial relationship between the allegedly defamatory statements and [the defendant's] New York activities."  *Id.*

Other decisions are in accord.  *See, e.g.*, *Kingstown Cap. Mgmt. L.P. v. CPI Prop. Grp., S.A.*, 167 N.Y.S.3d 92, 94 (1st Dep't 2022) ("[P]laintiffs failed to demonstrate an articulable nexus between defendants' New York activities and the cause of action for defamation.  Beyond an allegation in the federal action that several phone calls and emails were exchanged and a meeting held in New York in anticipation of a deal (which was ultimately consummated in Europe), nothing in the record suggests that defendants conceived, drafted, published, or distributed the press release in this state." (citations omitted)); *Prince v.*

15

*Intercept*, 634 F. Supp. 3d 114, 130 (S.D.N.Y. 2022) ("Although Mr. Emmons acknowledges that he had contact with New York during his employment at The Intercept, Plaintiff failed to satisfy the 'something more' standard because Mr. Emmons's contacts with New York were not related to the creation of the Article's allegedly defamatory statements." (footnote omitted)); *see also Quad Cap. Portfolio A LLC v. AbbVie Inc.*, 156 N.Y.S.3d 741, 741-42 (1st Dep't 2022) (Section 302(a)(1) did not support personal jurisdiction over "plaintiffs' fraudulent misrepresentation and concealment claims, which concern[ed] public statements that were made outside New York about defendant's reasons for pursuing [a] merger . . . and d[id] not concern the merger agreement itself").

Given the foregoing, the contacts alleged here do not suffice to support personal jurisdiction under Section 302(a)(1) with respect to any of the three allegedly injurious and defamatory actions by Defendant: the Client Contacts, the LinkedIn Post, and the Email.[7] None of the challenged conduct was "purposefully directed at New York, as opposed to reaching New York fortuitously." *Tannerite Sports*, 135 F. Supp. 3d at 230 (citation omitted). Put otherwise, Plaintiff has not pleaded facts that plausibly suggest that Defendant's statements were "projected into New York and target[ed] New Yorkers," let alone that Defendant's "conduct also included something more." *Best Van Lines*, 490 F.3d at 249.

### 1. The Client Contacts

The Court starts by analyzing the Client Contacts. As discussed above, Plaintiff alleges that on "November 28, 2022, the Defendant stated that he urged all of his clients to terminate their investment relationship with the Plaintiff's Parent Company; upon information and belief, the Defendant disseminated to these clients false information regarding the

---

[7] Plaintiff stresses that the WhatsApp messages between Defendant and Jake "are not the basis of Plaintiff's claims." Opp. at 12-13.

business practices of the Plaintiff." Compl. ¶ 45.  Two days later, Defendant again threatened to "label the Plaintiff as being a Ponzi scheme to his clients – which, in many instances, were also the Plaintiff's clients.  Indeed, upon information and belief, the Defendant executed his threats, resulting in the Plaintiff's loss of investors and investment funds." *Id.* ¶ 46.

Nowhere in the Complaint, however, does Plaintiff allege that any of the clients who received Defendant's defamatory communications were in New York, or even that any of those clients had ties of any kind to New York.  The burden of establishing such facts falls squarely on Plaintiff.  *See Troma*, 729 F.3d at 217.  At most, the Complaint recounts how, in June 2022, Defendant "advised [Jake] of his business clientele and *potential* investors based within the State of New York." Compl. ¶¶ 25, 27 (emphasis added).  But the Complaint contains no allegation that the clients with whom Defendant spoke in November 2022 had any association with New York.  *See generally id.*  Nor do the declarations.  *See generally* Brett Decl.; Jake Decl.  Only in its brief does Plaintiff vaguely assert that "in or around late November 2022, [Defendant] falsely stated to his client contacts, including clients located in New York and/or with business interests in New York, that Plaintiff was engaged in a Ponzi scheme." Opp. at 5 (citing Compl. ¶¶ 45-46).  But "the law is clear that a party may not amend pleadings through a brief." *Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 80 (2d Cir. 2022) (quotation marks and citation omitted); *accord Clanton v. UMG Recordings, Inc.*, 556 F. Supp. 3d 322, 327 n.1 (S.D.N.Y. 2021) ("It is axiomatic that a complaint cannot be amended by the briefs in opposition to a motion to dismiss." (brackets and citation omitted)).

The Court therefore finds no basis to conclude that any of Defendant's alleged contacts were with clients connected with New York.  Plaintiff has thus failed to meet its threshold burden of establishing that the Client Contacts were "purposefully directed at New

York, as opposed to reaching New York fortuitously." *Tannerite Sports*, 135 F. Supp. 3d at 230 (citation omitted).  Accordingly, Section 302(a)(1) does not support exercising personal jurisdiction over Plaintiff's claims against Defendant based on the Client Contacts.

### 2.  The LinkedIn Post

The Court turns next to the LinkedIn Post, which – of the three allegedly defamatory actions – is the most comparable to the conduct at issue in *SPCA*.  In dicta, *SPCA* noted that if the defendant had "complained of [her organization's] volunteers' treatment by [the plaintiff]," it "might well [have] entail[ed] a sufficiently substantial relationship between the allegedly defamatory statements and [the defendant's] New York activities as to warrant a finding of long-arm jurisdiction."  963 N.E.2d at 1230.  The fact that this statement is dicta is not a reason, by itself, for the Court to disregard it.  *See Banks v. Yokemick*, 144 F. Supp. 2d 272, 285 (S.D.N.Y. 2001) ("Principles of federalism, comity, and common sense obligate federal courts to assign due weight to any evidence, including dictum, that may shed light on how the state courts would read local law.").  The Court therefore looks to whether, in the LinkedIn Post, Defendant was complaining about Plaintiff.

Plaintiff summarily asserts that the LinkedIn Post was about Plaintiff rather than the Parent Company.  *See, e.g.*, Compl. ¶¶ 50-51; Opp. at 13.  But this "conclusory allegation" is belied by the copy of the LinkedIn Post that Plaintiff submitted, and where the two conflict, the LinkedIn Post "controls and the allegation is not accepted as true."  *Amidax*, 671 F.3d at 147; *see In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 676 (2d Cir. 2013) ("conclusory" allegations are "insufficient for specific personal jurisdiction purposes"); *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998) (similar).

Even granting Plaintiff the benefit of "all *reasonable* inferences," nothing in the post suggests that it was about Plaintiff as opposed to the Parent Company.  *Fat Brands*, 75 F.4th

at 125 (citation omitted; emphasis added); *cf. Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)

("Determining whether a complaint states a plausible claim for relief . . . requires the

reviewing court to draw on . . . common sense.").  The LinkedIn Post does not unambiguously

refer to any person or place in New York.  Instead, it mentions "@the79thgroup spearheaded

by David Webster, at Southport," and it describes Defendant having "raised millions for many

developers across the UK."  LinkedIn Post at 2.  Although there is a place named Southport,

New York, there is no suggestion that Defendant was referring to a western New York town

over 200 miles away from New York City.  *See Hartford Fire Ins. Co. v. Orient Overseas*

*Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000) (court may take judicial notice

of basic geographical facts).  The only reasonable inference is that Defendant was referring to

Southport, U.K., which appears to be where the Parent Company is headquartered.  *See* Email

at 2 (identifying, as the address of "Mr David We[b]ster" of the "79th Group," a building in

"Southport, PR8 4HQ").  Accordingly, the presumed intended audience of the LinkedIn Post

was LinkedIn users who conduct (or might conduct) business with the U.K.-based Parent

Company, not users who conduct (or might conduct) business with the New York-based

Plaintiff.

   Further, even if the LinkedIn Post were about Plaintiff rather than about the Parent

Company, there is no indication that anyone from New York ever saw the post.  Plaintiff

concedes that it is "unable to confirm the identity of [Defendant's] LinkedIn followers."  Brett

Decl. ¶ 7.  At most, Plaintiff suggests that "based upon the number of followers and the nature

of the Defendant's business, it is reasonably believed that discovery will confirm that there are

several with direct ties to the State of New York."  *Id.*  Even granting Plaintiff the benefit of

that speculative inference, "several" followers "with direct ties" to New York, *id.*, is not

enough for the Court to conclude that the LinkedIn Post "was purposefully directed at New

York, as opposed to reaching New York fortuitously," *Tannerite Sports*, 135 F. Supp. 3d at 230 (citation omitted).

### 3. The Email

Finally, the Court considers the Email. Defendant sent the Email only to two recipients: Jake and Godwin. Compl. ¶ 53; Email at 8. Plaintiff does not argue that Jake's receipt of the email suffices for personal jurisdiction. Instead, Plaintiff emphasizes that Godwin was copied on the Email. *See, e.g.*, Opp. at 13 ("Plaintiff's claims arise out of statements Defendant published to third-parties," including the Email sent to Godwin). Yet Plaintiff never satisfactorily explains why Godwin's inclusion on the Email satisfies the prerequisites for invoking Section 302(a)(1).

Plaintiff relies heavily on the fact that Godwin is "affiliated with the New York-based real estate investment firm Godwin Capital." Brett Decl. ¶ 10; *see* Opp. at 6, 9, 13. Plaintiff does not allege, however, that Defendant knew that Godwin was affiliated with a New York-based firm. *See Shrader v. Biddinger*, 633 F.3d 1235, 1247-48 (10th Cir. 2011) ("Although email is directed to particular recipients, email addresses typically do not reveal anything about the geographic location of the addressee. Thus, if the plaintiff does not show that the defendant otherwise knew where the recipient was located, the email itself does not demonstrate purposeful direction of the message to the forum state, even if that happens to be where the recipient lived."). If Defendant did not know that Godwin had any affiliation with New York, then Defendant can hardly be described as having "purposefully directed" the Email "at New York." *Tannerite Sports*, 135 F. Supp. 3d at 230 (citation omitted). Indeed, if anything, the fact that the Godwin email address copied on the Email had a U.K. domain name further supports the conclusion that Defendant did not purposefully direct the Email at New York. *See* Email at 8 (sent to "investments@godwindevelopments.co.uk"); *Name.Space,*

*Inc. v. Network Sols., Inc.*, 202 F.3d 573, 577 (2d Cir. 2000) (identifying ".us" and ".uk" as two of approximately 240 two-letter country-code top-level domains).

In sum, the Court holds that Section 302(a)(1) does not provide a statutory basis for exercising personal jurisdiction over Defendant.

### B. Due Process

Alternatively, the Court holds that the exercise of personal jurisdiction over Defendant would not "comport with constitutional due process principles." *Schwab*, 22 F.4th at 121 (citation omitted); *see Realuyo v. Vila Abrille*, No. 01-cv-10158 (JGK), 2003 WL 21537754, at *8-11 (S.D.N.Y. July 8, 2003) (after holding that Section 302(a)(1) did not support exercising personal jurisdiction, holding in the alternative that exercising personal jurisdiction would violate due process).

"As the Supreme Court has long held, due process demands that each defendant over whom a court exercises jurisdiction have some 'minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Schwab*, 22 F.4th at 121 (brackets in original) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "Opinions in the wake of the pathmarking *International Shoe* decision have differentiated between general or all-purpose jurisdiction, and specific or case-linked jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). "A state court may exercise general jurisdiction only when a defendant is essentially at home in the State." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (quotation marks and citation omitted). "Specific jurisdiction, on the other hand, depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is

therefore subject to the State's regulation." *Goodyear*, 564 U.S. at 919 (brackets, quotation marks, and citation omitted).

Plaintiff asserts that Defendant "only challenge[s] the exercise of *general* jurisdiction." Opp. at 2. According to Plaintiff, Defendant "does not address, much less defeat, the exercise of *specific* personal jurisdiction over him; his Motion is entirely focused on challenging general personal jurisdiction – a type of jurisdiction that Plaintiff does not assert." *Id.* at 13. Plaintiff also faults Defendant for "rel[ying] exclusively on the Supreme Court's seventy-eight year old decision in *International Shoe*, presumably unaware of the decades of post-*International Shoe* jurisprudence that has fundamentally reshaped the way federal courts analyze personal jurisdiction." *Id.*

The Court does not read Defendant's papers as challenging only the exercise of general personal jurisdiction. Because Defendant is a *pro se* litigant, the Court must "liberally construe" his briefs and read them "to raise the strongest arguments they suggest." *Publicola v. Lomenzo*, 54 F.4th 108, 111 (2d Cir. 2022) (per curiam) (quoting *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017) (per curiam)); *see also Brown v. City of New York*, 862 F.3d 182, 187 (2d Cir. 2017) ("The discretion trial courts may exercise on matters of procedure extends to a decision on whether an argument has been [forfeited or] waived."). Defendant quotes *International Shoe*'s statement of the minimum-contacts requirement, and he argues that there are not "sufficient minimum contacts in the forum in which the Court[] sits," and that "even presence in [a] state is not enough to support a demand that someone will be liable to suits unrelated to that activity." Br. at 3; *see also, e.g.*, Reply at 3 ("[I]t would I think be surprising if saying something about a UK company on a UK LinkedIn account gives rise to Jurisdiction of the United Sta[t]es."); *id.* ("The fact is that all of the cases quoted by the Plaintiff's Counsel in respect of legal standard for personal jurisdiction all have one thing in

common.  There needs to be some act like the 'aval' in the A.I Trade Finance Inc. case or the execution of contract as in the Burger King case.").  These statements suffice for Defendant to raise a specific-personal-jurisdiction defense.  That Defendant did not use the exact phrase "specific personal jurisdiction" is no reason for the Court to ignore the thrust of his argument, given his *pro se* status.  As for the fact that Defendant cites only *International Shoe*, the Court observes not only that Defendant is *pro se*, but also that *International Shoe* "remains" the "canonical decision" on personal jurisdiction.  *Ford*, 141 S. Ct. at 1024.

Because (as noted) Plaintiff relies only on specific personal jurisdiction, the Court concentrates its analysis there.  "The contacts needed for [specific personal] jurisdiction often go by the name 'purposeful availment.'"  *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).  These contacts "must be the defendant's own choice and not random, isolated, or fortuitous.  They must show that the defendant deliberately reached out beyond its home – by, for example, exploiting a market in the forum State or entering a contractual relationship centered there."  *Id.* at 1025 (brackets, quotation marks, and citations omitted); *see Hanson v. Denckla*, 357 U.S. 235, 253 (1958) ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.").  "Yet even then – because the defendant is not 'at home' – the forum State may exercise jurisdiction in only certain cases."  *Ford*, 141 S. Ct. at 1025.  The plaintiff's claims "must arise out of or relate to the defendant's contacts with the forum."  *Id.* (quotation marks and citation omitted).  "A plaintiff must establish [personal] jurisdiction with respect to each claim asserted."  *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004) (emphasis omitted).

"On two occasions, the United States Supreme Court has specifically considered when states may constitutionally exercise jurisdiction over non-residents in defamation actions." *Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1028 (2d Cir. 1997).  Both cases are instructive.

In *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 772-74 (1984), the Supreme Court held that a New Hampshire court had personal jurisdiction over the defendant, a publisher whose regular circulation included selling between 10,000 and 15,000 copies of its eponymous magazine in New Hampshire.  The Court explained that, through these sales, the publisher "continuously and deliberately exploited the New Hampshire market," and therefore "it must reasonably anticipate being haled into court there in a libel action based on the contents of its magazine."  *Id.* at 781.

That same day, in *Calder v. Jones*, 465 U.S. 783, 784-86 (1984), the Supreme Court held that a California court had personal jurisdiction over the defendant, a national magazine based in Florida that published an allegedly libelous article (authored and edited by Florida residents) about the plaintiff (a California resident).  "About 600,000 of [the 5 million] copies [of the magazine sold every week], almost twice the level of the next highest State, [we]re sold in California."  *Id.* at 785.  The Supreme Court stated that "[t]he allegedly libelous story concerned the California activities of a California resident.  It impugned the professionalism of an entertainer whose television career was centered in California.  The article was drawn from California sources, and the brunt of the harm, in terms both of [the plaintiff's] emotional distress and the injury to her professional reputation, was suffered in California."  *Id.* at 788-89 (footnote omitted).  In short, "California [wa]s the focal point both of the story and of the harm suffered."  *Id.* at 789.  Personal jurisdiction over the defendants was therefore "proper in California based on the effects of their Florida conduct in California."  *Id.* (quotation marks omitted).

24

"Although *Calder* and *Keeton* were handed down simultaneously on similar subjects, they relied on independent, if conceptually overlapping, methods of demonstrating minimum contacts – *Keeton* on the defendant's overall activity within the forum state; *Calder* on the in-state effects of out-of-state activity." *Best Van Lines*, 490 F.3d at 243.  With these and other precedents in hand, the Court turns to the three allegedly injurious and defamatory actions by Defendant: the Client Contacts, the LinkedIn Post, and the Email.

### 1.   The Client Contacts

Due process bars the Court from exercising personal jurisdiction over Plaintiff's claims based on the Client Contacts.  As explained above in the Court's analysis of Section 302(a)(1), Plaintiff has failed to meet its burden of establishing that any of the clients with whom Defendant spoke had any connections with New York at all, let alone connections sufficient to support exercising jurisdiction.  Plaintiff has thus failed to meet its burden of establishing a *prima facie* case that, through the Client Contacts, Defendant purposefully availed himself of New York.  *See Ford*, 141 S. Ct. at 1024-25; *Troma*, 729 F.3d at 217.  Therefore, the Court lacks personal jurisdiction over Plaintiff's claims against Defendant based on the Client Contacts.

### 2.   The LinkedIn Post

To its credit, Plaintiff does not argue that the LinkedIn Post creates minimum contacts with New York merely because it is accessible to New York users of the internet.  "Internet activities such as mass emailing, website hosting, and Internet posting are peculiarly non-territorial because the internet operates 'in' every state regardless of where the user is physically located, and when a person places information on the Internet, he can communicate with persons in virtually every jurisdiction." *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 844 (10th Cir. 2020) (further quotation marks and citation omitted).  "If . . . a person's act of

placing information on the Internet subject[ed] that person to personal jurisdiction in each

State in which the information [were] accessed, then the defense of personal jurisdiction, in

the sense that a State has geographically limited judicial power, would no longer exist.  The

person placing information on the Internet would be subject to personal jurisdiction in every

State." *ALS Scan, Inc. v. Digit. Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002);

*accord Briskin v. Shopify, Inc.*, 87 F.4th 404, 421 (9th Cir. 2023) ("[O]ur law has long

recognized that as a matter of due process, web-based platforms cannot be subject to specific

jurisdiction in any forum from which they are accessible, which would lead to the eventual

demise of all restrictions on personal jurisdiction." (quotation marks and citation omitted)).

Recognizing this difficulty, courts have held that, when applying cases such as *Calder*

in the internet context, there must be "proof that the out-of-state defendant's internet activity

is expressly targeted at or directed to the forum state." *Realuyo*, 2003 WL 21537754, at *10

(brackets omitted) (quoting *Young v. New Haven Advoc.*, 315 F.3d 256, 262-63 (4th Cir.

2002)); *accord Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 325-26 (5th Cir. 2021)

("To circulate a print magazine, the publisher must send it somewhere.  But websites are

'circulated' to the public by virtue of their universal accessibility, which exists from their

inception. . . . [M]ere accessibility cannot demonstrate purposeful availment, as we and our

sister circuits have held many times."); *XMission*, 955 F.3d at 845 ("[M]erely posting

information on the internet does not, in itself, subject the poster to personal jurisdiction

wherever that information may be accessed.  Rather, postings may give rise to personal

jurisdiction if they are directed specifically at a forum state audience or otherwise make the

forum state the focal point of the message." (ellipses and citation omitted)); *Mobile*

*Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Hous. Metroplex, P.A.*, 623 F.3d 440,

446 (7th Cir. 2010) ("A plaintiff cannot satisfy the *Calder* standard simply by showing that

the defendant maintained a website accessible to residents of the forum state and alleging that the defendant caused harm through that website."); *Cadle Co. v. Schlichtmann*, 123 F. App'x 675, 679 (6th Cir. 2005) (declining to subject the defendant to jurisdiction in Ohio because while the content of the website post "was about an Ohio resident," the post "did not concern that resident's Ohio activities" and "nothing on the website specifically target[ed] or [wa]s even directed at Ohio readers, as opposed to the residents of other states"). By conducting this inquiry, courts ensure that, before exercising specific personal jurisdiction over an out-of-state defendant, the defendant actually has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State." *Burger King*, 471 U.S. at 475 (quoting *Hanson*, 357 U.S. at 253); *see Shrader*, 633 F.3d at 1241 ("[T]his emphasis on intentionally directing internet content or operations at the forum state has its grounding in the 'express aiming' requirement the Supreme Court developed in *Calder* to deal with the somewhat analogous question of specific jurisdiction based on content in nationally distributed print media.").

The question becomes whether the LinkedIn Post was "expressly targeted at or directed to" New York, *Realuyo*, 2003 WL 21537754, at *10 (citation omitted) – that is, whether the LinkedIn Post was "directed specifically at a [New York] audience or otherwise ma[d]e [New York] the focal point of the message," *XMission*, 955 F.3d at 845 (citation omitted). As explained above in the Court's analysis of Section 302(a)(1), nothing in the LinkedIn Post suggests that it was about Plaintiff (as opposed to the Parent Company) or that the post was otherwise targeted at a New York audience. Even if Plaintiff had "several" LinkedIn followers "with direct ties" to New York, Brett Decl. ¶ 7, that is a far cry from *Keeton*'s 10,000 to 15,000 issues sold monthly that constituted "continuously and deliberately exploit[ing] the New Hampshire market," 465 U.S. at 772, 781, or *Calder*'s 600,000 copies of the magazine sold weekly in California, "the State in which [the plaintiff] live[d] and

work[ed] and in which the [magazine] ha[d] its largest circulation," 465 U.S. at 785, 790; *see,*
*e.g.*, *Chaiken*, 119 F.3d at 1029 ("*Maariv*'s Massachusetts sales are a tiny fraction of its total
circulation and are insignificant compared to the 10,000 to 15,000 copies of a monthly
publication found to justify jurisdiction in *Keeton*.  We doubt that four copies per day, or even
the 183 copies of the Sunday edition, constitute the substantial number of copies that makes it
fair to exercise jurisdiction over a non-resident publisher." (quotation marks and citation
omitted)); *Ouazzani-Chahdi v. Greensboro News & Rec., Inc.*, 200 F. App'x 289, 292 (5th
Cir. 2006) (insufficient contacts to establish personal jurisdiction in Texas because defendant
publication "circulated only three copies in Texas, far fewer than the 600,000 that were sent in
*Calder* (in which personal jurisdiction was found to exist), and also fewer than the 70 in
[another Fifth Circuit case] (in which no jurisdiction was found)").  And, as already discussed,
"the fact that the [LinkedIn Post] could be accessed anywhere, including [New York], does
not by itself demonstrate that [Defendant was] intentionally directing [the LinkedIn Post] to a
[New York] audience."  *Young*, 315 F.3d at 263.  "Something more than posting and
accessibility is needed" to support a finding of purposeful availment.  *Id.*  There is no
"something more" here.

Thus, the Court finds that the LinkedIn Post was not "expressly targeted at or directed
to" New York.  *Realuyo*, 2003 WL 21537754, at *10 (citation omitted).  In other words, by
publishing the LinkedIn Post, Defendant did not purposefully avail himself of New York.
Defendant thus could not "reasonably anticipate being haled into court" in New York "in a
libel action based on the contents of" the LinkedIn Post.  *Keeton*, 465 U.S. at 781.  To the
extent that Defendant has any business contacts with New York, Plaintiff's claim based on the
LinkedIn Post does not arise out of or relate to those contacts.  *See Walden v. Fiore*, 571 U.S.
277, 286 (2014) ("Due process requires that a defendant be haled into court in a forum State

based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." (quoting *Burger King*, 471 U.S. at 475)).

Several times, Plaintiff emphasizes Defendant's contacts with the United States as a whole. *See, e.g.*, Opp. at 10 (Defendant "promotes himself as serving a 'global' market and does not exclude the United States from his business activities. Indeed, his ventures appear to publicly court U.S. investors as an investor application on his current venture's website, which offers United States Dollars as among the three currencies in which investors may choose to receive their principal and interest payments." (citation omitted)); *id.* ("That the Defendant welcomes and seeks business in the United States is further confirmed by his conspicuous appearance in U.S.-based business and investment publications."); *id.* at 11 (noting Defendant's "interest in a Florida-based property management company"). But Defendant's contacts with *other* states do not enable a New York court to exert specific personal jurisdiction over Plaintiff's state-law claims. It is true, as Plaintiff notes (Opp. at 11), that "attempt[s] to serve a nationwide market do[] not diminish any purposeful contacts with [New York]." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171 (2d Cir. 2010). But attempts to serve a nationwide market do not, by themselves, *create* purposeful contacts with New York, either.

In sum, due process precludes the Court from exercising personal jurisdiction over Plaintiff's claims against Defendant based on the LinkedIn Post.

### 3. The Email

The Email fares no better than the other putative bases for exercising personal jurisdiction over Defendant. As discussed above in the Court's analysis of Section 302(a)(1), Plaintiff does not allege that Defendant knew that Godwin was affiliated with a New York-

based firm.  *Cf. Calder*, 465 U.S. at 789-90 (the defendants "knew that the brunt of th[e] injury" caused by their defamatory conduct "would be felt by [the plaintiff] in the State in which she lives and works and in which the [magazine] has its largest circulation").  If Defendant did not know that Godwin had any affiliation with New York, then Defendant can hardly have "reasonably anticipate[d] being haled into court there in a libel action based on the contents of [the Email]."  *Keeton*, 465 U.S. at 781.  Thus, Plaintiff has failed to satisfy its burden of establishing that the Court has personal jurisdiction over Plaintiff's claims against Defendant based on the Email.  *See Troma*, 729 F.3d at 217.

In conclusion, exercising personal jurisdiction over Defendant would violate due process.

## II.      The Court Declines to Authorize Jurisdictional Discovery

Plaintiff requests, in the alternative to dismissal, that the Court hold Defendant's motion to dismiss in abeyance and permit the parties to engage in jurisdictional discovery.  *See* Opp. at 15-16.  The Court denies the request.

"A district court has wide latitude to determine the scope of discovery, and is typically within its discretion to deny jurisdictional discovery when the plaintiff has not made out a prima facie case for jurisdiction."  *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 133 n.6 (2d Cir. 2022) (brackets, ellipsis, and citation omitted).  Here, "even accepting all of [Plaintiff's non-conclusory] allegations as true, as a matter of law, [Plaintiff] ha[s] not made a *prima facie* showing that the [Court] could properly exercise jurisdiction over [Defendant]."  *Id.*  The Court therefore denies Plaintiff's request for jurisdictional discovery.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's motion to dismiss. Because the Court dismisses the Complaint for lack of personal jurisdiction, its dismissal is

without prejudice.  *See Miller v. Brightstar Asia, Ltd.*, 43 F.4th 112, 126 (2d Cir. 2022) ("A dismissal for lack of jurisdiction must be without prejudice rather than with prejudice." (citation omitted)).  Plaintiff's letter motion pertaining to discovery (ECF No. 40) is DENIED as moot.

The Clerk of Court is respectfully directed to terminate the currently pending motions (ECF Nos. 29 and 40) and close the case.


Dated: January 3, 2024
         New York, New York

                                        SO ORDERED.


                                        _____
                                        JENNIFER L. ROCHON
                                        United States District Judge